

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00383-CR

_____

DANIEL GRECO, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. F16-1287-431

Before Kerr, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Forty-year-old Anjanette Harris (Anjie) was found dead in an unincorporated area of Denton County known as Hilltown.[1]  Appellant Daniel Greco confessed to strangling Anjie to death and dumping her body in Hilltown.  Anjie was approximately eighteen weeks' pregnant with Appellant's unborn child at the time of her death.[2]  The unborn child, who was a boy, also died.  The amended indictment charged Appellant with capital murder as follows:

> [Appellant] . . . on or about the 6th day of March[] 2016 and anterior to the presentment of this Indictment, in the county and state aforesaid, did then and there intentionally or knowingly cause the death of an individual, namely, [Anjie], by strangling [Anjie] with [his] hand or [a] piece of rubber or a belt or an object unknown or by cutting or stabbing [Anjie] with a knife, and did then and there intentionally or knowingly cause the death of another individual, namely, [the] unborn child of [Anjie], by causing the death of [Anjie], while said unborn child was in gestation of said [Anjie], and both murders were committed during the same criminal transaction[.]

A jury convicted Appellant of the offense of capital murder as charged in the amended indictment but declined to impose the death penalty.  *See* Tex. Penal Code

---

[1]Witnesses described Hilltown as a homeless community; a dumping zone with raw sewage; and an area made up of "dirt roads, a bunch of trailer houses, a bunch of woods[,] . . . [and] a lake."

[2]A forensic scientist testified that based on the DNA analysis conducted on the placental material, "at least 99.99998 percent of the male population is excluded from the possibility of being the biological father of the child" and that "the observed genetic results are 20 million times more likely under the scenario that [Appellant] is the true biological father of the child . . . than if the father is an untested, unrelated random man from the Caucasian population."

Ann. § 19.03(a)(7). As a result, Appellant was sentenced to life imprisonment without parole.

Appellant raises two issues on appeal arguing that (1) the trial court erred by not dismissing the case with prejudice due to the spoliation of evidence by state actors or, alternatively, by not "at the least issuing a spoliation instruction to the jury" and (2) the evidence of causation and mens rea is insufficient to warrant a conviction for capital murder. Appellant's spoliation arguments present a battle of the experts, requiring deference to the trial court's credibility determination, and a showing of bad faith, which is not present. Regarding Appellant's sufficiency challenges, the record contains expert testimony supporting the causation element and Appellant's confession that references his knowledge of Anjie's pregnancy, which has been held sufficient to support the "knowingly" element of a capital-murder conviction. Thus, we affirm.[3]

## II. Alleged Spoliation of Evidence

Prior to trial, Appellant filed a motion to dismiss due to destruction of evidence. Appellant argued that the State had destroyed biological material from

---

[3]Because Appellant does not challenge on appeal his role in Anjie's murder, we omit a factual background setting forth the gruesome acts that precipitated her death. We will set forth the facts related to the challenges that Appellant raises on appeal within the discussion of each of his issues.

Anjie's neck and biological evidence from the unborn child[4] and that testing of these items could have exonerated him. Over the span of four days, the trial court held a pretrial hearing on the motion to dismiss due to destruction of evidence. Additionally, Appellant filed a brief in support of his motion, the State filed a response, and Appellant filed a reply. The trial court ultimately denied the motion.

In his first issue, Appellant argues that the trial court erred by denying his motion to dismiss the case or, alternatively, by not giving a spoliation instruction. The crux of Appellant's argument is that because the State discarded or destroyed the placenta and various types of biological evidence from the unborn child,[5] his case should therefore have been dismissed. Because this presented a battle of the experts—with experts from both sides opining on whether such evidence was even available—we must defer to the trial court's credibility determinations. And because, as explained below, Appellant has not shown bad faith on the part of the State in failing to retain nonexistent or additional biological materials from the unborn child and the placenta, we cannot say that the trial court erred by denying Appellant's motion to dismiss.

---

[4]Appellant complained that the medical examiner had failed to (1) perform a thorough fetopsy that would have included obtaining skin for genetic testing, (2) retain the placenta, and (3) collect fetal blood, but Appellant's motion focused on the failure to collect fetal blood.

[5]Because Appellant does not complain on appeal about the alleged destruction of evidentiary material from Anjie's neck, we limit our analysis to the alleged spoliation of fetal biological evidence.

### A. Standard of Review

When reviewing a trial court's decision on a motion to dismiss, we apply a bifurcated standard, giving almost total deference to the trial court's findings of fact that are supported by the record, as well as any mixed questions of law and fact that rely upon the credibility of witnesses. *See State v. Krizan-Wilson*, 354 S.W.3d 808, 815 (Tex. Crim. App. 2011); *Tope v. State*, 429 S.W.3d 75, 79 (Tex. App.—Houston [1st Dist.] 2014, no pet.). For pure questions of law or mixed questions that do not depend on credibility determinations, our review is de novo. *See Krizan-Wilson*, 354 S.W.3d at 815.

### B. Law on Spoliation

Spoliation concerns the loss or destruction of evidence. *Guzman v. State*, 539 S.W.3d 394, 401 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). In addressing the failure to preserve evidence in a criminal trial, there is a distinction between "material exculpatory evidence" and "potentially useful evidence." *Arizona v. Youngblood*, 488 U.S. 51, 57–58, 109 S. Ct. 333, 337 (1988); *Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010). That difference informs our analysis when deciding whether the State's failure to disclose or preserve evidence violates a defendant's guarantee of due process of law. *See Illinois v. Fisher*, 540 U.S. 544, 547–48, 124 S. Ct. 1200, 1201–02 (2004).

If the State withholds material exculpatory evidence, a federal due process violation occurs regardless of whether the State acted in bad faith. *Id.* at 547, 124

S. Ct. at 1202. Thus, a *Brady*[6] claim requires proof that the sought-after evidence was both material and favorable to the defendant such that there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011).

By contrast, to prove a federal due process violation based on a state's destruction of merely "potentially useful evidence," a defendant must show that the State acted in bad faith in destroying the evidence. *Fisher*, 540 U.S. at 547–48, 124 S. Ct. at 1202; *Youngblood*, 488 U.S. at 57–58, 109 S. Ct. at 337. *Youngblood* described potentially useful evidence as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57, 109 S. Ct. at 337. "Although courts occasionally blur the distinction between *Youngblood* and *Brady*, *Youngblood* is properly applied to cases in which the government no longer possesses the disputed evidence, whereas *Brady* is properly applied to cases in which exculpatory evidence remains in the government's possession." *Moody v. State*, 551 S.W.3d 167, 170 (Tex. App.—Fort Worth 2017, no pet.) (mem. op.) (footnote omitted) (citing *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999)).

Here, Appellant contends that the State, acting through the Tarrant County Medical Examiner's Office, discarded or destroyed the placenta and biological

---

[6]*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) (dealing with the due process violation that occurs whenever the State suppresses or fails to disclose material exculpatory evidence).

evidence from the unborn child. Appellant's brief states that "the biological evidence is material, thus a showing of bad faith by the State is not needed." Although Appellant phrases his complaint as a *Brady* complaint, it is more properly considered as a complaint under *Youngblood* for the destruction of "potentially useful evidence" because it is uncontroverted that the State does not possess the desired evidence. *See id.*; *Rodriguez v. State*, 491 S.W.3d 18, 31 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (treating a *Brady* claim about a lost surveillance video as a *Youngblood* claim); *see also Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337–38 (holding that the police's failure to preserve potentially useful evidence was not a denial of due process of law absent the defendant's showing of bad faith on the part of the police). Such a claim requires a showing of bad faith. *Fisher*, 540 U.S. at 547–48, 124 S. Ct. at 1202.

### C.     What the Record Shows

At the pretrial hearing, Ashleigh Berg, a forensic investigator working in the Denton County Sheriff's Office, testified that she had been told by Troy Taylor, a death investigator for the Denton County branch of the Tarrant County ME's Office, that there should be two blood cards (one from Anjie and one from the unborn child) because an autopsy had been performed on Anjie and on the unborn child and because it was standard procedure to obtain a blood card from each. Berg went to the ME's Office to collect the two blood cards. When Berg arrived, there was only one blood card; it was from Anjie. Berg reported that fact to Taylor. Taylor said that he would look into it and would report back to her. Taylor consulted with the ME's

7

Office and reported back to Berg that no blood card had been collected from the unborn child during the autopsy, but Taylor did not have an explanation for why none was collected.

Farah Plopper, a forensic DNA analyst at the University of North Texas Center for Human Identification, had read notes stating that there were two different blood cards that would come from the ME's Office. Plopper later received an email stating that was not correct and that there was only a blood card for Anjie. When asked whether she receives fetal blood for testing, she responded, "Not very often."

Dr. Marc Krouse, the Deputy Chief Medical Examiner who assisted Dr. Allison Mautone[7] with the autopsy of Anjie and the unborn child, said that the autopsy was done according to standard operating procedures. Dr. Krouse agreed that the physician's guidelines that he and Dr. Mautone were required to follow state that in homicide cases, all tissues, bodily fluids (including vitreous, blood, urine, and gastric contents), and any other fluid shall be retained perpetually. Dr. Krouse clarified that they keep "all tissues that [they have] looked at," which includes anything that bears grossly visible pathology; for anything that does not contain gross pathology, they just take representative samples.

Dr. Krouse testified that as part of this autopsy, they saved "representative bits of organs" that they had examined in Anjie and the unborn child. Dr. Krouse

---

[7]The record shows that Dr. Mautone participated in a one-year fellowship of subspecialty training in forensic pathology with the Tarrant County ME's Office and performed the autopsy on Anjie and the unborn child.

explained that Dr. Mautone, as part of her fellowship, was required to keep specimens of certain tissues from every autopsy that she worked on and then prepare microscopic slides. Dr. Krouse said that Dr. Mautone made the decisions about what to keep from the autopsy but that he had added his input. Here, he told Dr. Mautone to make sure that she kept some fetal tissue so that he could go back and look for any microscopic evidence of fetal disease, if necessary. Dr. Krouse testified that portions of the placenta were cut and placed in a paraffin block.[8] When the defense asked for tissue to use for DNA testing, Dr. Krouse told them to use the paraffin block.

---

[8]A person from the histology department at the Tarrant County ME's Office explained the process of preserving tissue:

> In order to get from a piece of tissue actually to a slide, there is a process. It is kind of like pickling. You have to be able to get all the water out of the tissue to preserve it. You start off with formalin, formaldehyde preserves the tissue. Then it goes through a series of alcohols, which removes the water, and xylenes, which removes the alcohol, and then ultimately in paraffin wax. Paraffin wax is used to put the piece of tissue in a mold, and then the wax is poured around the piece of tissue. After the wax is hardened, you are able to pull it off in a cassette. And then it is put on a machine called a microtome. And the microtome cuts a very thin section of that piece of tissue, [thinner] even than a piece of paper. It is placed on a water bath, where all the wrinkles come out of the paraffin and the tissue. And it is picked up on a glass slide. It is put on heat to remove the paraffin. Then it is processed through a series of stains. And then the stains actually stain the tissue. Some of it is background, some of it is different parts of the tissue. And that's what the pathologists use to make their interpretation. A cover slip is placed on top of the glass slide. That helps preserve that tissue indefinitely. And so we have pieces of tissue from the beginning of . . . when the [ME's] Office actually started.

9

Dr. Krouse testified that there was no blood card from the unborn child because there was no fetal blood.[9] Dr. Krouse said that the unborn child's body had macerated[10] and had started to decompose. Dr. Krouse explained that one of the things that happens during decomposition is "water all goes away. That's one of the first things that happens. So liquid blood is gone. All that's left is just stained blood vessels with the hemoglobin pigment from the red blood cells imbedded within them." Dr. Krouse stated that if the unborn child had blood, they would have kept it. And because none was kept, that led him to conclude that there was no fetal blood even though there was no note specifically stating that there was no fetal blood.

Dr. Evan Matshes, the defense's expert whose primary area of practice is pediatric forensic pathology, testified that he reviewed the autopsy report, slides of fetal tissue, and paraffin blocks of fetal tissue. Defense counsel told Dr. Matshes about Dr. Krouse's explanation—that because the "[unborn child] was macerated, there would have not been blood because all of the liquid would have been gone from the [unborn child]"—and asked whether he agreed with Dr. Krouse's position. Dr. Matshes responded, "I cannot agree or disagree with the actual facts, not having

_____

[9]During Dr. Krouse's testimony at the pretrial hearing, he was asked about two blood cards and explained that there were two blood cards from Anjie—one from the autopsy and the other "with a sexual assault kit by trace evidence." This might explain why there was initially a reference to two blood cards that would come from the ME's Office.

[10]A description of maceration is set forth on pages 23–25.

10

been at the autopsy. But I disagree in principle with his statements." Dr. Matshes based his disagreement on his presumption that the unborn child had blood:

> This [unborn child], by description, has early maceration. The fetus is of an estimated age of 18 weeks. [Unborn children] contain blood, all of them. This [unborn child] would have had blood. A large pocket of blood would have been in the heart. The heart is just a pump that contains four chambers that would have contained blood. And it is my experience that when people say, in an infant or [an unborn child], that they were unable to obtain blood, that commonly they lacked the right equipment to do the job because they are tiny babies, tiny blood vessels. They may have lacked the skill or the training to do a delicate job. But, in my experience, it is unusual to not be able to get even a small volume of blood, as blood does exist in [an unborn child].

Dr. Matshes opined that there absolutely would have been blood in an unborn child at this stage. Dr. Matshes testified that the fetal blood could have been used for tests to study the unborn child's genes and to look for disorders that would not or could not have been visible to the naked eye. Dr. Matshes said that it is useful to have fetal blood when it is available.

Dr. Matshes was questioned on whether a fetopsy was performed in this case. Dr. Matshes testified that "[t]echnically a fetopsy was performed, and an autopsy was performed on the baby. But a typical thorough fetal autopsy was not performed." Dr. Matshes explained why he believed that a thorough fetal autopsy had not been performed:

> In addition to simply removing the organs and dissecting them and reporting them in a report and studying some of them under the microscope, there's many other tests we need to do. While the placenta was studied here, it was not studied in detail as represented by the very few photographs and the very limited amount of tissue that was available

11

to be studied under the microscope. In many cases the -- an explanation for the fetal demise, as well as how long the [unborn child] has been dead, can be obtained from the placenta. Tissues, fluids[,] and the like can be collected for additional specialized testing as one tries to understand how the [unborn child had] met [his or her] end. There are entire textbooks written on the subject and, in fact, in the broader context where this falls into the biggest relevance is when parents lose a baby of a stillbirth and they are trying to understand not only why that [baby] died, but what their risk of recurrence is. So a lot of time, money[,] and science has gone into understanding the fetal autopsy and its relevance.

Dr. Matshes would have expected a skin sample to have been taken if there had been a thorough fetal autopsy done "[b]y the books." Had a skin sample been obtained, a skin punch biopsy could have been taken and submitted to a lab where skin fibroblast testing could have been performed to check for chromosomal abnormalities or genetic diseases.

With regard to the placenta, Dr. Matshes testified that "effort was put into evaluating the placenta" but that "[t]he histology that was obtained was limited to three slides," which was below what he would have expected in a standardized placental exam. Dr. Matshes said that "much information can be gleaned from a thorough standardized workup" of the placenta but that in this case, "the placenta was not thoroughly examined as it certainly could have been." Dr. Matshes's understanding was that the placenta was thrown away, and so he could not learn from it. Dr. Matshes said that based on the tissues that were available to him, he was not able to answer all of the defense's questions.

On cross-examination, Dr. Matshes agreed that he was not at the autopsy and that the people who were there had more information to form an opinion on what had been seen. Dr. Matshes said that he did not have access to the Tarrant County ME's standard operating procedures but said that Dr. Krouse and Dr. Mautone had done "[i]n general, . . . thorough work." When asked whether he had any scientific certainty that there would have been fetal blood in this case, Dr. Matshes responded, "[W]ith a reasonable degree of medical certainty I would have expected blood to be present." In a follow-up question, Dr. Matshes was asked, "[B]ut you don't know for sure that fetal blood was there?" He responded, "You are correct, sir." Dr. Matshes agreed that portions of the placenta were retained, but he said that "[m]ore placenta tissue does not appear to have been retained to allow for a more thorough examination." Yet Dr. Matshes did not have any evidence or opinion that Dr. Krouse had willfully destroyed any of the evidence that Dr. Matshes had said that he needed.

### D. Analysis

#### 1. Motion to Dismiss

Appellant focuses most of his argument in his brief on the State's failure to preserve fetal blood. The testimony regarding the failure to preserve any blood from the unborn child posed a battle of the experts: Dr. Krouse maintained that the unborn child's body had started to macerate, leaving no fetal blood to collect or to maintain, while Dr. Matshes opined that there should have been fetal blood to collect. It is not for us to decide which expert was correct. The trial court was the sole judge

13

of the credibility of the experts, and therefore we must give total deference to the trial court's credibility determinations. *See Krizan-Wilson*, 354 S.W.3d at 815; *Tope*, 429 S.W.3d at 79.

Appellant also has not demonstrated bad faith on the part of the State. Appellant's own expert could not say for sure that fetal blood existed in this case, only that he would have expected fetal blood to be present. Appellant thus did not produce any evidence that fetal blood existed or that the State had failed to preserve it or had destroyed it. The State has no duty to disclose evidence that does not exist. *See Matthews v. State*, No. 01-15-01100-CR, 2017 WL 491285, at *5 (Tex. App.— Houston [1st Dist.] Feb. 7, 2017, pet. ref'd) (mem. op., not designated for publication); *Evans v. State*, No. 01-13-00593-CR, 2015 WL 1501808, at *6 (Tex. App.—Houston [1st Dist.] Mar. 31, 2015, pet. ref'd) (mem. op., not designated for publication). Accordingly, there can be no evidence of bad faith because the evidence that Appellant desired to obtain was not found during the autopsy.

Appellant's brief also makes a passing reference to the medical examiners' failure to retain the entire placenta and to preserve skin from the unborn child. Dr. Krouse stated that the autopsy was done according to standard operating procedures and that they had kept anything that bore grossly visible pathology. In this case, the medical examiners kept fetal tissue so that slides could be made, and portions of the placenta were placed in a paraffin block; slides of the fetal tissue and the placental paraffin block were made available to the defense. Yet Dr. Matshes

14

opined that the medical examiners should have done more evaluation and should have saved the placenta and more biological evidence from the unborn child while he simultaneously concluded that Dr. Mautone and Dr. Krouse had done "thorough work." Moreover, Dr. Matshes specifically stated that he did not have any evidence or opinion that Dr. Krouse had willfully destroyed any of the evidence that Dr. Matshes said that he needed, and the defense did not put on any other witness to testify about bad faith on the part of the State. Based on the record, we conclude that Appellant did not show bad faith on the part of the State in failing to retain the entire placenta and additional biological evidence from the unborn child.[11]

Having held that Appellant failed to show that there was fetal blood that could have been retained and that Appellant failed to show bad faith on the part of the State in failing to retain the whole placenta and skin samples from the unborn child, we

---

[11]The Houston First Court of Appeals has explained why it is improper for courts to require the police to preserve all material that might be of conceivable evidentiary significance in a particular prosecution, and it can be said that the same logic should apply to not require the State, via the ME's office, to retain all biological material that might be of conceivable evidentiary significance in a particular prosecution:

> A policy requiring the [police] department to preserve every video ever taken would be at odds with the purpose of the bad faith requirement, which is to limit the State's obligation to preserve evidence "to reasonable grounds" and only in those cases "where the interests of justice most clearly require it."

*McVay v. State*, No. 01-19-00480-CR, 2020 WL 7391556, at *5 (Tex. App.—Houston [1st Dist.] Dec. 17, 2020, pet. ref'd) (mem. op., not designated for publication) (citations omitted).

15

hold that the trial court did not err by denying Appellant's motion to dismiss due to destruction of evidence.

### 2. Jury Instruction

In the alternative, Appellant complains of the trial court's declining to give an adverse instruction to the jury regarding spoliation. There must be a showing of bad faith on the part of the State to warrant a spoliation instruction. *See Moody*, 551 S.W.3d at 172 (citing *Snell v. State*, 324 S.W.3d 682, 684 (Tex. App.—Fort Worth 2010, no pet.), and *White v. State*, 125 S.W.3d 41, 44 (Tex. App.—Houston [14th Dist.] 2003), *pet. ref'd*, 149 S.W.3d 159 (Tex. Crim. App. 2004)). Appellant's argument fails because, as demonstrated in the preceding analysis, there was no showing of bad faith. In the absence of a showing of bad faith, we hold that the trial court did not commit error in refusing the spoliation instruction. *See Matthews*, 2017 WL 491285, at *5 (holding that trial court did not commit error in refusing appellant's spoliation instruction regarding the lack of a video because appellant did not produce evidence that the video existed, that the State had destroyed it, or that the State had acted in bad faith).

### 3. Disposition of Spoliation Challenges

Having held that the trial court did not err by denying Appellant's motion to dismiss or by declining to give a spoliation instruction, we overrule Appellant's first issue.

16

### III. Sufficiency of the Evidence

In his second issue, Appellant argues that the evidence is insufficient to warrant a conviction for capital murder. Specifically, Appellant challenges the sufficiency of the evidence to show (1) that he caused the unborn child's death and (2) that he intentionally or knowingly caused the unborn child's death. The evidence demonstrates that Appellant knew that Anjie was pregnant, that he intentionally caused her death, that the unborn child died as a result of Anjie's death, and that Appellant thus at least knowingly caused the unborn child's death.

#### A.    Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences

are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

## B. Law on Capital Murder

A person commits capital murder if he commits murder—intentionally or knowingly causes the death of an individual—and murders more than one person during the same criminal transaction. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A). A "person" includes an individual. *See id.* § 1.07(38). An "individual"

18

is defined as a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth. *See id.* § 1.07(26).

## C. What the Record Shows

Appellant's sufficiency argument on the causation element stems from his expert's testimony that the unborn child could have died up to two to three days prior to Anjie; thus, under Appellant's defensive theory, the unborn child's cause of death was independent of the strangulation that caused Anjie's death. Appellant points to evidence that Anjie could have had a miscarriage prior to her death: her pregnancy was high risk due to her age, she had failed to seek early medical care, she had consumed alcohol and had smoked cigarettes, and there was some evidence that the unborn child was in distress as shown by the hypercoiled umbilical cord.

Appellant's sufficiency argument regarding the mens rea element is grounded on his confession that he "simply snapped" due to the drugs he had ingested; thus, his strangling of Anjie was a spontaneous event. He further points to his confession to show that he never mentioned wanting to hurt the unborn child or that he wanted to hurt Anjie in order to terminate her pregnancy.

We will summarize the evidence that Appellant relies on for both of his sufficiency challenges and set forth the controverting evidence that supports the jury's verdict before we proceed to our analysis of Appellant's sufficiency challenges.

### 1. Evidence of High-Risk Pregnancy and Delay in Seeking Medical Care

Defense expert Dr. Matshes testified that a forty-year-old pregnant woman, such as Anjie, is considered to have a higher risk pregnancy than a twenty-five-year-old pregnant woman. He further testified that a woman who delays in seeking medical care for her pregnancy can contribute to a high-risk pregnancy, as can alcohol use and smoking. Dr. Matshes said that it is common for women to have a miscarriage and not immediately be aware of it.

With regard to Anjie's delay in seeking medical care, the record demonstrates that she went to Life Talk Resource Center on February 25, 2016—ten days before she was found dead—to confirm her pregnancy. The intake paperwork referenced epileptic seizures and noted that Anjie was not taking anti-seizure medicine. Anjie also noted on the intake paperwork that she was a smoker, that she drank alcohol, and that this was an unplanned pregnancy.

A nurse performed a urine pregnancy test, which was positive, and a limited sonogram.[12] Based on the information that Anjie provided, the nurse estimated that the gestation was 18 weeks, 5 days. Based on the sonogram, the nurse estimated that the gestation was 17 weeks, 3 days. The nurse opined that Anjie could have a viable pregnancy because the unborn child was inside the uterus. The nurse did not see anything that concerned her and recommended that Anjie follow up in 30 days. The

---

[12]The nurse testified that a limited sonogram cannot determine gender or whether there are any birth defects.

doctor at Life Talk signed off on the nurse's recommendation. During the appointment, Anjie received a sonogram photo, which was still in her purse ten days later when it was found near her dead body.

### 2. Evidence of Alcohol Consumption and Smoking

The man who accompanied Anjie to her sonogram testified that she had lit a cigarette on the way out of the clinic. Cigarettes and a lighter were found in Anjie's purse after her death.

The purse also had a handwritten list that an investigator interpreted to be a grocery list; that list included beer.

On the evening of March 5, 2016, which was the day before Anjie was found dead, Anjie had two beers with the family that she lived with. Anjie then went to a neighbor's house and had a pineapple margarita. Around 9:30 that evening, Anjie went to Appellant's house. Appellant told one of the detectives that he and Anjie had smoked marijuana and had consumed alcoholic drinks after she had arrived at his house.

The toxicology report from the autopsy revealed that Anjie had .248 grams per deciliter of alcohol in the femoral blood, and her urine and vitreous fluid each contained .263 grams per deciliter of alcohol. The toxicology report also showed that Anjie was negative for drugs.

### 3. Evidence of Fetal Distress and Autopsy Findings

Dr. Mautone began the autopsy on Anjie and her unborn male child on March 7, 2016, at 12:45 p.m. Anjie's body showed evidence of asphyxia (inability to get enough oxygen), sharp-force injuries, and blunt-force injuries. Anjie's neck had horizontal linear contusions, which were "consistent with like a mark imprint or a ligature." Anjie's neck also had fourteen sharp-force injuries—some of which were stab wounds, and others were superficial cuttings. Dr. Mautone listed ligature strangulation[13] as the cause of Anjie's death, but she also listed multiple sharp-force injuries on the neck as a contributory cause of death because she could not say exactly when the latter were inflicted or how much of a role they may have played in Anjie's death.

Dr. Mautone testified that the gestational age of the unborn child was approximately 18 weeks and that there were no structural or congenital abnormalities. Dr. Mautone found that the umbilical cord was hypercoiled—having more twists in it than normally seen. Dr. Mautone testified that a hypercoiled umbilical cord is a soft finding[14] of fetal distress and that the fetal distress could have come from Anjie's death. Although Dr. Mautone expected that the unborn child would have had alcohol in his system because Anjie's blood-alcohol level was .248, Dr. Mautone did not find

---

[13]Dr. Mautone explained that strangulation impedes blood flow to the brain, causing the unavailability of oxygen and the loss of consciousness.

[14]Dr. Mautone explained that a soft finding "doesn't prove anything."

22

any evidence that the unborn child had fetal-alcohol syndrome or had died of fetal-alcohol syndrome.

Dr. Mautone concluded that the unborn child died because Anjie died. Dr. Mautone explained,

> It is fair in that mom being dead guarantees that [the unborn child] will be dead. You can have an intrauterine fetal demise for other reasons when mom is still alive and well. I don't have that situation so, yes, I found nothing else to account for the [unborn child's] death. But the [unborn child's] death was a certain outcome with the maternal death.

Dr. Mautone further explained that once Anjie died, the unborn child died because he was only 18 weeks' gestation, was dependent on his mother for all his needs, and was not viable outside the womb. Dr. Mautone did not find a reason for the unborn child's demise separate from Anjie's death.

Dr. Mautone testified that fetal maceration plays a role in determining how long an unborn child has been dead. Dr. Mautone explained that fetal maceration is the way that an unborn child will decompose:

> So a lot of the way we would decompose is due to bacteria that's present in our systems. [We] are . . . full of it in our gastrointestinal tract and everywhere else. [An unborn child] is sort of living in a sterile space. They don't really acquire that bacteria until after birth. So they decompose without the aid of bacteria. So there is nothing sort of helping break them down other than just natural cellular processes. So I think to make that distinction between putrefaction, or the bacteria-driven decomposition, and maceration, which is without the bacteria, is why it is called that.

Dr. Mautone further explained that there are grades of fetal maceration to approximate the time of death:

23

And the way generally [an unborn child] decomposes or that you grade maceration is based on the external skin surface. So the more red the skin looks and the more sloughing you have, the more maceration you have. That will eventually transition into a browner color and it eventually looks like a leathery, mummified appearance.

It takes an unborn child approximately two weeks to become mummified. Dr. Mautone gave the unborn child a fetal maceration grade of II (on a scale where V is the highest level of maceration), which she said fit with the time of Anjie's death. Dr. Mautone testified that she could not give an exact time of death for an adult or an unborn child. She said that an autopsy provides an estimated time of death specified as a broad range because only an eyewitness can give an exact time of death.

Dr. Krouse testified that Anjie's body "was found the day prior [to the autopsy], and obviously [had] been dead for 18 to 24 hours probably at that point."[15] Dr. Krouse testified that there was nothing wrong with the unborn child. Dr. Krouse said that a hypercoiled cord just means that it is twisted and that the cord twists and untwists while the baby moves around in utero. Dr. Krouse could not say for sure whether the hypercoiled cord was a sign of fetal distress from the mother's death.

Dr. Krouse said that the unborn child's blood-alcohol level would have been about the same as his mother's because alcohol crosses into the placenta, but Dr. Krouse did not think that fetal-alcohol syndrome could be determined by examining the unborn child because he was only 18 weeks' gestation. When asked

---

[15]The prosecutor expanded the time frame that Dr. Krouse had given by asking, "So anywhere from 27 to 36 hours, would that sound about right, based on what you saw?" Dr. Krouse responded, "That would fit, yeah."

24

whether he had any reason to believe that Anjie's alcohol intake had caused the unborn child's death, Dr. Krouse said that he could not answer affirmatively; he could only say that alcohol increases the risk of intrauterine death in fetuses but that no one has a mechanism to predict whether it causes death. Based on Dr. Krouse's training and experience and the findings from the autopsy, he did not have any reason to believe that anything other than Anjie's death had caused the unborn child's death.

Dr. Krouse said that Dr. Mautone had characterized the fetal maceration here as II out of V, but he was not familiar with that scale. He characterized fetal maceration as being mild, moderate, or advanced. He explained what it takes to go from mild to moderate:

> Right around two to three to four days, enough of the connective tissues under the skin are breaking down. The plates of bone in the skull start to overlap. I believe there are nine ossification centers in the [unborn child's] skull. And they are joined together by tough connective tissue. And, after a few days, that connective tissue breaks down, and now the bones of the skull start to overlap. So now we are at a stage of moderate fetal maceration.

Dr. Krouse explained that he did not see any of those indications in the unborn child and agreed that the lack of those signs would indicate that the unborn child had been deceased for fewer than three days. When asked if the time frame for the unborn child's death fell within the same 27- to 34-hour[16] time frame as Anjie's death, Dr. Krouse agreed that was consistent with the unborn child's dying due to his

---

[16]In this question, the prosecutor used "34" hours instead of 36 hours as he had in a prior question.

25

mother's death. Dr. Krouse testified that the estimated time of the unborn child's death could have been anywhere from hours up to "a couple days max, two days" prior to the autopsy.

Dr. Matshes mostly agreed with the autopsy findings. Dr. Matshes testified that a pregnant woman whose blood-alcohol level was approximately .24 would have exposed her unborn child to risk and that the alcohol use could have negatively impacted the unborn child's brain over time. When asked if an unborn child will always be killed by a mother who drinks alcohol, Dr. Matshes responded, "Absolutely not." Dr. Matshes testified that he had no evidence that alcohol had caused the unborn child's death.

Dr. Matshes, however, disagreed with Dr. Krouse's estimate of the maceration, stating that the unborn child's body was "[n]owhere near" fully decomposed. But Dr. Matshes agreed with Dr. Krouse's opinion on the timing of the unborn child's death, opining that the unborn child had died "anywhere right at the time of the death of the mother" due to what had happened to her or "up to two days [prior to the autopsy], similar to Dr. Krouse['s estimate]." Dr. Matshes could not, based on what he had seen, scientifically differentiate between whether the unborn child had died right at the moment of Anjie's death or prior thereto. Dr. Matshes testified that it is scientifically possible that the unborn child had died prior to Anjie's death and that there is no scientific or medical evidence to refute that. But Dr. Matshes agreed that strangulation of the mother is high risk with regard to the unborn child.

26

### 4. Evidence that Appellant Knew of Anjie's Pregnancy

With regard to Appellant's knowledge of Anjie's pregnancy, text messages between Appellant's cell phone and Anjie's cell phone reflected that he knew of her pregnancy by January 17, 2016. During Appellant's confession on March 7, 2016, Texas Ranger Clair Barnes asked Appellant if he knew that Anjie was pregnant, and he responded affirmatively. The prosecutor confirmed again during the redirect examination of Ranger Barnes that Appellant had known that Anjie was pregnant on the night that he murdered her:

Q. When you are talking to [Appellant] about Anjie['s] being pregnant, did he ever say, ["W]ell, I knew she was at one time, but I wasn't sure when she came over to my house that night[']?

A. No, he did not.

Q. In fact, was the context of that conversation about her being pregnant, and when you asked him did you know that she was pregnant and he said yes, was he just previously describing that something had come over his brain, and I just wanted to strangle her?

A. Yes.

Q. Then you asked him if he knew that she was pregnant?

A. Yes, sir.

Q. So did you have any doubt in your mind that he was talking about what was going on late evening hours, early morning hours of March 5th into March 6th?

A. Not at all.

. . . .

27

Q. And as you [were] talking to him about the charge of capital murder . . . [,] did he ever at that point in time say[,] ["H]old on a second[.] I didn't know she was pregnant when I strangled her["?]

A. No, he did not.

Q. At that point in time did he say[,] ["H]old on a second[.] I didn't really mean to kill [Anjie;] that was just an accident["?]

A. No, he didn't.

Q. At that point in time did he say[,] ["H]old on a second[.] [Y]ou are telling me she's pregnant, but I didn't mean to kill that baby, or know that by me strangling [Anjie] that I killed that baby["?]

A. No, he did not.

Q. He is just nodding along with you in agreement to what you are saying; is that correct?

A. That is correct.

**D. Analysis**

**1. Causation**

As explained below, there is no evidence that the unborn child's death occurred independently of Anjie's death, the defense misconstrued the medical examiner's testimony about the timing of the unborn child's death, and there was testimony from two experts that the unborn child had died due to Anjie's death.

Appellant argues that it is possible that the unborn child had died prior to and independent of Anjie's death and points to her high-risk pregnancy due to her age, her failure to seek adequate health care, her consumption of alcohol (including evidence of her blood-alcohol level at the time of her death), and her smoking cigarettes.

28

Appellant's arguments were controverted by the testimony and the evidence. All three experts testified that there was no evidence that the unborn child had fetal-alcohol syndrome. Moreover, although there was testimony that Anjie's age had put her pregnancy at a higher risk than a pregnant woman who was twenty-five years old, no evidence was presented that her age, her failure to seek health care earlier in her pregnancy, or her cigarette smoking had caused her to miscarry prior to her death.

Appellant also points to the testimony that the death of the unborn child "could have occurred up to two days prior," implying that this time frame relates to two days prior to Anjie's death. But Dr. Krouse did not testify to that, and the prosecutor clarified during Dr. Matshes's cross-examination that the testimony about the timing of the unborn child's death began from the time that the unborn child was viewed in the autopsy that took place on March 7:

> Q. Let's discuss a little bit about fetal maceration, because I think there was some perhaps miscommunication going on between what was being told to you about what [Dr.] Krouse [had testified to] versus what you were agreeing to. So I want to make sure [that] we're on the same page. When we talk about fetal maceration, we are talking about *working back from the time that the [unborn child] is observed*; is that correct?
>
> A. I don't really understand your question.
>
> Q. So when we are talking about fetal maceration in approximating a time of death, I know we are not ever going to give a specific, but when we are talking about approximating time of death, is it fair to say we are *working back from when the [unborn child] is observed outside of the womb*, either by the medical examiner or somebody else?
>
> A. Yes, sir.

Q. We are not talking about working back from the time the [unborn child] died, because that makes zero sense, correct?

A. Correct.

Q. *And so Dr. Krouse testified that the [unborn child] had been dead for hours up until two days, based on what he saw in the fetal maceration. That would be based on when he saw the [unborn child] during the autopsy, correct?*

A. *Correct.*

Q. Were you shown photographs of the autopsy?

A. Yes.

Q. And did those photographs include photos of the [unborn child]?

A. Yes.

Q. And were you able to make visual observations on fetal maceration based on those photographs?

A. Yes.

Q. And so now knowing that Dr. Krouse said that [] the approximate time of death *based on his view of fetal maceration when he saw the [unborn child]* was hours prior up to two days, do you agree with that?

A. *Yes.* [Emphases added.]

The range of "hours prior up to two days" before the autopsy, which was opined as

the timing of the unborn child's death, corresponds with the timing of Anjie's death:

she was last seen alive by her friends and neighbors on the evening of March 5

(approximately two days prior to the autopsy), and her body was found the morning

of March 6 (approximately one day prior to the autopsy). Anjie died sometime after

9:35 p.m. on March 5, which was when she texted Appellant that she was headed to

30

his house, and sometime prior to 3:10 a.m. on March 6 when Appellant dumped her body after strangling her to death. This is roughly 33 to 39 hours prior to the autopsy that started at 12:45 p.m. on March 7. This correlates with the "hours prior up to two days" time frame that Dr. Krouse had testified to and that Dr. Matshes had agreed with.

Additionally, Dr. Matshes's testimony contradicted itself. He testified that the unborn child was "[n]owhere near" fully decomposed—thus implying that the unborn child's time of death was very close to the time of the autopsy—while simultaneously opining that the unborn child had died prior to Anjie's death. The jury was free to decide what weight, if any, to give to this testimony. *See Queeman*, 520 S.W.3d at 622.

Moreover, the jury had testimony from two experts—Dr. Mautone and Dr. Krouse—who concluded that the unborn child had died due to Anjie's death. And Dr. Matshes also agreed that was a possibility. The State was not required to disprove all reasonable alternative hypotheses that might be inconsistent with Appellant's guilt for the evidence to be sufficient to support his conviction.[17]

---

[17]Although Appellant contends that "[a] conviction cannot stand when the [S]tate does not disprove all reasonable hypothes[e]s except the defendant's guilt," the law is the exact opposite: "[T]he State does not have to disprove all reasonable alternative hypotheses which may be inconsistent with an accused's guilt for the evidence to be legally sufficient to support a conviction." *See Jones v. State*, No. 01-14-00385-CR, 2015 WL 4591745, at *6 (Tex. App.—Houston [1st Dist.] July 30, 2015, no pet.) (mem. op., not designated for publication); *see also Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) ("We have rejected the reasonable hypothesis construct as a measure of legal sufficiency.").

31

Accordingly, we hold that the evidence is sufficient to support the causation element of Appellant's capital-murder conviction.

## 2. Mens Rea

Appellant contends that "this was a spontaneous event and not one [that] was planned in advance or given much thought at all" and that "there is no showing that he directed any act toward [Anjie's] unborn child." Appellant further argues that his prior knowledge of Anjie's pregnancy "alone is [not] enough to prove [that] he intentionally or knowingly caused the death of the [unborn child] by killing the mother." Case law, however, refutes Appellant's argument.

In *Estrada v. State*, the Texas Court of Criminal Appeals dealt with a similar argument and disposed of it as follows:

> Consistent with the applicable statute [(Texas Penal Code Section 6.04 defining "knowingly")], the jury charge provided that a "person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Viewed in . . . the light most favorable to the verdict, the evidence is sufficient to support a finding that appellant knew that [the woman] was pregnant. A jury could reasonably infer from this evidence that appellant was aware that strangling a pregnant woman and stabbing her [back, neck, and head a total of] thirteen times with a knife was reasonably certain to cause the unborn child's death.

313 S.W.3d 274, 279, 305 (Tex. Crim. App. 2010) (footnote omitted).

Here, the jury charge contained the same definition of knowingly. The record demonstrates that Appellant knew that Anjie was pregnant. Thus, the jury could reasonably infer that Appellant was aware that strangling Anjie or stabbing Anjie's

neck while she was approximately 18 weeks' pregnant was reasonably certain to cause the unborn child's death. *See id.* Accordingly, we hold that the evidence is sufficient to support the mens rea element of Appellant's capital-murder conviction.

### 3. Disposition of Sufficiency Challenges

Viewed in the light most favorable to the verdict, and deferring to the jury's determinations of the weight to be given the evidence and the credibility of the witnesses, the evidence supports the jury's verdict of guilt. *See id.* (holding evidence sufficient to sustain capital-murder conviction because appellant knew that complainant was pregnant, and even though he did not stab her unborn child, "[a] jury could reasonably infer" that appellant was aware that strangling a pregnant woman and stabbing her back, neck, and head a total of thirteen times was reasonably certain to kill the unborn child); *Eguia v. State*, 288 S.W.3d 1, 8–10 (Tex. App.— Houston [1st Dist.] 2008, no pet.) (holding evidence sufficient to prove that appellant knowingly caused the death of complainant's unborn child because a rational jury could find that appellant knew that complainant was pregnant and that stabbing her throat would cause her unborn child to fail to be born alive). We overrule Appellant's second issue.

## IV. Conclusion

Having overruled Appellant's two issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 12, 2021